**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RNS SERVICING, LLC, and Illinois Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>SPIRIT CONSTRUCTION SERVICES, INC., a Delaware Corporation, and STEVEN VAN DEN HEUVAL, a Wisconsin citizen,<br><br>Defendants. | Case No.<br><br>**TRIAL BY JURY DEMANDED** |

**<u>COMPLAINT</u>**

NOW COMES Plaintiff, RNS Servicing, LLC, by its undersigned counsel, brings this action against Defendants SPIRIT CONSTRUCTION SERVICES, INC. and STEVEN VAN DEN HEUVAL and complains as follows:

**<u>NATURE OF THE CASE</u>**

1. In 2007, Defendant Spirit Construction Services, Inc. ("Spirit") and its Chief Executive officer, Defendant Steven Van Den Heuval ("Steve"), induced IFC Credit Corporation ("IFC") to lend approximately $3.9 million to Ronald Van Den Heuval ("Ron"), Steven's brother, by securing the loan with promises that Spirit (a) had executed four separate, enforceable engineering, procurement, and construction contracts ("EPC Contracts") for the new construction or construction modification of four largescale tissue paper manufacturing plants, (b) had subcontracted two companies owned by Ron, Tissue Products Technology Corp. ("TPTC") and Partners Concepts Development, Inc. ("PCDI"), to perform subcontracting work during the construction and modification of these four tissue paper plants, and (c) would pay

back the loan to Ron by paying all amounts that would become due by Spirit to TPTC or PCDI under the EPC Contracts to IFC until the loan was fully repaid.

2. Ron defaulted on the loan and IFC sued Ron, TPTC, and PCDI in the district for repayment and sued Spirit for an injunction requiring Spirit to pay the sums promised to IFC. In 2008, IFC was awarded a judgment against Ron, TPTC, and PCDI, which it was unable to collect. In 2009, the court dismissed the injunction count against Spirit on the basis that IFC lacked standing at the time because the construction contemplated by the EPC Contracts had not yet begun.

3. Thereafter, on or about July 27, 2009, IFC filed for Chapter 7 Bankruptcy relief in the U.S. Bankruptcy Court for the Northern District of Illinois, BK No. 09-27094 (the "IFC Bankruptcy"). To date, the IFC Bankruptcy is still pending. During the pendency of the IFC Bankruptcy, Plaintiff RNS Servicing, LLC ("RNS Servicing") entered into an "Asset Purchase and Transition Services Agreement" and a "Supplemental Asset Purchase and Transition Services Agreement" with the Chapter 7 trustee to IFC's bankruptcy estate to purchase the assignment of IFC's judgment against Ron, TPTC, and PCDI and also the claims against Spirit and Steve which are made in this Complaint.

## PARTIES

4. Plaintiff RNS Servicing is a Limited Liability Company existing and organized in the State of Illinois with its principal place of business in Cook County, Illinois. RNS Servicing has two member, Stephen Csar and Rebecca Elli, both of whom are residents of the State of Illinois. RNS Servicing is engaged in financial services in the State of Illinois. RNS Servicing entered into an "Asset Purchase and Transition Services Agreement" and a "Supplemental Asset Purchase and Transition Services Agreement" with the Chapter 7 trustee for IFC's bankruptcy

estate (the "IFC Bankruptcy Trustee") to purchase certain assets of the IFC Bankruptcy estate, as more fully described below.

5. Defendant Spirit is a corporation existing and incorporated under the laws of the State of Delaware with its principal place of business located in State of Georgia. Spirit is a largescale construction contractor engaging in heavy industrial construction business throughout the United States, including in the State of Illinois, with considerable specific expertise in engineering, procurement, and construction of tissue paper plants. Spirit was the signatory on a certain Acknowledgment and Consent to Assignment in which Spirit made certain misrepresentations which are at issue in this case, as more fully described below.

6. Defendant Steve is the Chief Executive Officer of Spirit and is a citizen of the State of Wisconsin. Steve is Ron's brother and was the signatory, on behalf of Spirit, on a certain Acknowledgment and Consent to Assignment in which Spirit made certain misrepresentations which are at issue in this case, as more fully described below.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, exclusive of interest and costs, and diversity of citizenship exists between the Plaintiff and Defendants.

8. Venue is proper in this district pursuant to 28 U.S.C. § 139(b) as a substantial part of the events or omissions giving rise to the claim occurred in this district. Additionally, a certain Continuing Pledge Agreement more fully described below, has a forum-selection clause designating this judicial district as the proper venue for this action.

## RELEVANT NON-PARTIES

9. TPTC is a corporation existing and incorporated under the laws of the State of Wisconsin, having its principal place of business in the State of Wisconsin. TPTC is a party to a

certain Settlement Agreement, as more fully described below, as well as certain Master Lease Agreements and a Continuing Pledge Agreement, also described more fully below.

10. PCDI is a corporation existing and incorporated under the laws of the State of Wisconsin, having its principal place of business in the State of Wisconsin. PCDI is a party to a certain Settlement Agreement, as more fully described below, as well as certain Master Lease Agreements and a Continuing Pledge Agreement, also described more fully below.

11. Eco-Fibre, Inc. (f/k/a Re-Box Paper, Inc.) ("Eco-Fibre"), is a corporation existing and incorporated under the laws of the State of Wisconsin, having its principal place of business in the State of Wisconsin. Eco-Fibre is a party to a certain Settlement Agreement, as more fully described below.

12. Oconto Falls Tissue, Inc. ("Oconto Falls") is a corporation existing and incorporated under the laws of the State of Wisconsin, having its principal place of business in the State of Wisconsin. Oconto Falls is party to a certain Settlement Agreement, as more fully described below.

13. Ron is a citizen of the State of Wisconsin and resides in Wisconsin. Ron is the brother of Defendant Steve. During the relevant time period, Ron owned and/or operated TPTC, PCDI, Eco-Fibre, and Oconto Falls. Ron is also a party, individually, to a certain Settlement Agreement, as more fully described below.

14. IFC is a dissolved corporation, which had been incorporated under the laws of the State of Illinois. IFC had been in the business of providing equipment lease financing to commercial and industrial entities throughout the United States. On or about July 27, 2009, IFC filed for Chapter 7 Bankruptcy. To date, the IFC Bankruptcy is still pending.

15. Fortress Credit Corporation ("Fortress") is a corporation existing and incorporated in the State of Delaware with its principal place of business in New York City, New York.

Fortress is engaged in the financing/lending business and entered into a certain "Lease Agreement Rights Purchase Agreement" with IFC, as more fully described below.

16. George Washington Savings Bank ("GWS Bank") was an Illinois-based bank headquartered in Orland Park, Illinois, which was closed by the Illinois Department of Financial and Professional Regulation in February 2010. GWS Bank was engaged in the financing/lending business and had entered into a certain "Master Lease Receivable Sales Agreement" with IFC, as more fully described below.

17. ST Paper, LLC ("ST Paper") is a limited liability company existing and incorporated in the State of Wisconsin. ST Paper presently owns and operates the Oconto Falls tissue paper mill previously owned and operated by Oconto Falls Tissue, Inc. ST Paper was party to EPC Contracts at issue in this case, as more fully described below.

18. During the relevant time period, Sharad Tak was the owner of ST Paper and he executed the EPC Contracts between Spirit and ST Paper on behalf of ST Paper, as more fully described below.

## COMMON ALLEGATIONS

19. On or about June 10, 2005, IFC, as lessor, entered into Master Equipment Lease Agreement No. 801056 ("Master Lease No. 801056") with TPTC, PCDI, and Oconto Falls, jointly and severally, as co-lessees, for the lease of certain equipment and attachments used for tissue paper manufacturing at the Oconto Falls tissue paper plant in Oconto Falls, Wisconsin. (the "Line 1 Equipment").

20. IFC thereafter sold, assigned, and transferred to Fortress rights to certain specified lease payments related to Master Lease No. 801056 pursuant to a "Lease Agreement Rights Purchase Agreement" between IFC and Fortress.

21. On or about September 30, 2005, IFC, as lessor, entered into Master Lease Agreement No. 801070 ("Master Lease No. 801070") with TPTC and Eco-Fibre, jointly and severally, as co-lessees, for the lease of sixteen industrial after-dryers (the "After-Dryers"), along with related equipment and attachments (the "After-Dryer Equipment").

22. Ron, PCDI, and Oconto Falls each executed an unconditional written guaranty of TPTC's and Eco-Fibre's obligations under Master Lease No. 801070 and attached Lease Schedules (the "Master Lease No. 801070 Guaranties").

23. IFC thereafter sold, assigned, and transferred to the GWS Bank certain rights and to certain specified lease payments under one of the Lease Schedules to Master Lease No. 801070 (the "Assigned Lease Schedule"). The Assigned Lease Schedule covered seven After-Dryers of the sixteen After-Dryers that comprise the After-Dryer Equipment (the "GWS Bank After-Dryers"), as well as certain of IFC's rights to the Master Lease No. 801070 Guaranties, all pursuant to a "Master Lease Receivable Sales Agreement" between IFC and GWS Bank.

24. By October 2005, it had become apparent to IFC, Fortress, and GWS Bank that TPTC, PCDI, Oconto Falls, and Eco-Fibre—all companies owned and operated by Ron—would default on Master Lease No. 801056 and Master Lease No. 801070.

25. In order to devise a plan whereby Ron could avoid a takeover by Fortress of the Oconto Falls Tissue Plant, Ron enlisted the assistance of his brother, Steve, and his national construction company, Spirit.

26. Sometime in October 2005, Steve and Ron proposed a solution to IFC and Fortress. The basic, simplified proposal was as follows:

a. Spirit would execute five EPC Contracts with three tissue paper companies to build or upgrade five tissue paper plants: three in Wisconsin, one in Maryland, and one in Utah.

b. In turn, Spirit would commit to using Ron's companies as subcontractors on these significant projects to produce significant guaranteed future revenue for Ron's companies.

c. This guaranteed future revenue would allow Ron to first sell off equity in paper plants owned by his companies in order to pay off money owed to Fortress and GWS Bank—and partially pay off money owed to IFC—with respect to Master Lease No. 801056 and Master Lease No. 801070.

d. Finally, the guaranteed revenue generated by the Ron companies' subcontracting work for Spirit pursuant to the above referenced EPC Contracts would allow the Ron companies to buy back some equity in the paper plants and also fully pay off IFC over time.

27. In mid to late October 2005, Steve invited representatives from IFC to Wisconsin to discuss the complex proposal and to conduct some due diligence with respect proposed transaction.

28. During these meetings in October 2005, Steve reviewed and discussed the five pending EPC Contracts with IFC. Some of these EPC Contracts would later become the basis for the "Continuing Pledge Agreement" discussed in further detail below.

29. On or about November 25, 2005, attorneys collectively representing Ron and his companies, Steve, and Spirit faxed letters of intent regarding the five above-referenced EPC Contracts to IFC. *See* Letters of Intent, attached as Group Exhibit A.

30. One of the Letters of Intent, which outlined an EPC Contract between Spirit and Maryland Tissue Company ("MTC") for the construction of the Maryland tissue plant, was executed by Steve and Spirit. Pursuant to this letter of intent, Steve and Spirit represented, *inter alia*, that:

a. Spirit would enter into a $31 million EPC Contract with MTC to convert a de-inking pulp mill into a brand new tissue paper plant;

b. PCDI would purchase 50% equity in MTC for $5 million when the EPC Contract was signed;

c. TPTC would act as Spirit's subcontractor on the project whenever appropriate;

d. TPTC would manage the newly constructed tissue paper plant in exchange for $75,000 per month; and

e. TPTC would act as the marketing and sales agent for the newly constructed tissue paper plant in exchange for 4% of MTC's sales.

*See* Group Exhibit A at MTC LOI.

31. On or around December 27, 2005, Ron and ST Paper presented IFC with a "Summary of Key Business Terms" regarding ST Paper's intent to enter into three EPC Contracts with Spirit for the construction or upgrade of two of the Wisconsin tissue paper plants—including the Oconto Falls Tissue Paper Plant—and also the construction of the Utah tissue paper plant. *See* Summary of Key Business Terms, attached as Exhibit B.

32. TPTC, PCDI, Oconto Falls, and Eco-Fibre subsequently defaulted under the terms of Master Lease No. 801056 and Master Lease No. 801070. TPTC, PCDI, Oconto Falls, and Eco-Fibre failed to cure their defaults.

33. On August 25, 2006, IFC filed a lawsuit in the United States District Court for the Northern District of Illinois, Eastern Division, against TPTC and Eco-Fibre (as lessees) and Ron, PCDI, and Oconto Falls (as guarantors) (collectively, the "Ron Defendants"), Case No. 06 CV 4618 (the "IFC Lawsuit I"), asserting claims for breach of Master Lease No. 801070 and the

related Lease Schedules; for breach of the Master Lease No. 801070 Guaranties; and for injunctive relief for return of the After-Dryer Equipment.

34. On July 21, 2006, GWS Bank (as an assignee of IFC) also filed a lawsuit in the United States District Court for the Northern District of Illinois, Eastern Division against the Ron Defendants, Case No. 06 CV 3956 (the "GWS Bank Lawsuit"), asserting claims for breach of Master Lease No. 801070 and the Assigned Lease Schedules and for breach of the Master Lease No. 801070 Guaranties.

35. In September 2006, the IFC Lawsuit I was consolidated into the GWS Bank Lawsuit.

36. At this point in time, neither IFC nor Fortress filed a lawsuit with respect to the PCDI and Oconto Falls default on Master Lease No. 801056. However, the parties discussed the possibility of a Fortress takeover of the Oconto Falls Paper Plant if Fortress was not made whole through the type of transaction proposed by Steve and Ron referenced in Paragraph 26 of this Complaint.

37. For the next several months, IFC and GWS Bank on the one hand, and the Ron Defendants, on the other, negotiated settlement terms in an attempt to resolve all claims asserted against the Ron Defendants. The Ron Defendants agreed to pay all monies owed to GWS Bank pursuant to Master Lease No. 801070, all of the monies owed to Fortress pursuant to Master Lease No. 801056, and most of the monies owed to IFC on both leases.

38. On or around December 22, 2006, in furtherance of a possible settlement agreement, IFC and the Ron defendants executed a "Memorandum of Understanding for Equipment Purchase Agreement and Lease Pay-Off" (the "MOU"). *See* MOU, attached as Exhibit C. In addition to a full payoff to Fortress and GWS Bank and a partial payoff to IFC, the MOU contemplated the execution of a new Master Lease whereby IFC would lease the sixteen

After-Dryers to the Ron entities in exchange for $3.4 million dollars, to be paid back to IFC in installments. *See* Exhibit C at Section 2.B. The MOU also contemplated assignment of the Ron Defendants' "rights to receive payments under the Fixed Price Engineering, Procurement and Construction Agreement dated as of August 4, 2006 between ST Paper, LLC and Spirit Construction Services, Inc. up to $340,000 per month and in an aggregate amount of $3,400,000." *See* Exhibit C at Section 2.B.iv.

39. On March 28, 2007, the court entered a judgment in favor of GWS Bank and against the Ron Defendants in the amount of approximately $2.7 million.

40. On or about April 13, 2007, IFC and the Ron Defendants entered into a Settlement Agreement, effective March 28, 2007, resolving all claims then pending by and among IFC and the Ron Defendants in the IFC Lawsuit I as well as any potential claims IFC and Fortress may have had against the Ron Defendants with respect to the default on Master Lease No. 801056 (the "Settlement Agreement"). Pursuant to the Settlement Agreement, the Ron Defendants agreed to pay a Total Settlement Amount of approximately $23,400,000.00 (the "Total Settlement Amount"). *See* Settlement Agreement, attached as Exhibit D.

41. On or about April 16, 2007, the Ron Defendants paid approximately $20 million of the Total Settlement Amount from proceeds the Ron Defendants had obtained through the sale of equity in the Oconto Falls Paper Plant to ST Paper, LLC ("ST Paper"). Of the approximately $20 million paid, IFC received approximately $17,300,000—with roughly $17,000,000 of the $17,300,000 earmarked to fully pay off Fortress with respect to Master Lease No. 801056—and GWS Bank received approximately $2.7 million in satisfaction of its March 28, 2007 judgment.

42. As part of the Settlement Agreement, IFC agreed that the remaining $3.4 million of the Total Settlement Amount could be paid by PCDI and TPTC to IFC in ten consecutive monthly installments pursuant to a new Master Lease Agreement ("Master Lease No. 801109"),

whereby IFC leased ten of the After-Dryers previously leased under Master Lease No. 801070 to PCDI and TPTC, as described in attached Lease Schedules, with amendments. *See* Master Lease 801070 w/ Lease Schedules and Amendments, attached as Exhibit E.

43. Ron also executed an unconditional written guaranty of PCDI's and TPTC's obligations under the new Master Lease No. 801109 and attached Lease Schedules, with amendments (the "Master Lease No. 801109 Guaranty").

44. In addition, and as a condition for IFC entering into the Settlement Agreement and new Master Lease No. 801109, TPTC and PCDI also executed a Continuing Pledge Agreement dated March 28, 2007 (the "Continuing Pledge Agreement"). Pursuant to the Continuing Pledge Agreement, TPTC and PCDI pledged and assigned to IFC their right to receive $3,400,000 in subcontractor payments that the two companies were to receive from Spirit in connection with the four, fully executed EPC Contracts related to the four separate tissue paper plant construction projects referenced in Paragraphs 1–3 above (the "CPA EPC Contracts") as collateral for their indebtedness and lease obligations under the Settlement Agreement and new Master Lease No. 801109. *See* Continuing Pledge Agreement, attached as Exhibit F.

45. On or around April 18, 2007, in connection with the Settlement Agreement, new Master Lease No. 801109, and Continuing Pledge Agreement, PCDI and TPTC also borrowed an additional $440,000.00 from IFC pursuant to a Master Amendment Agreement. (the "Master Amendment Agreement"). The Master Amendment Agreement made explicit reference to and amended the Continuing Pledge Agreement by increasing the amount of subcontractor payments pledged to IFC as collateral from $3,400,000 to $3,902,220. *See* Master Amendment Agreement, attached as Exhibit G.

46. As such, pursuant to the Continuing Pledge Agreement (as amended by the Master Amendment Agreement), TPTC and PCDI pledged and assigned any and all rights to payment of up to $390,222.00 per month and payments in the aggregate of $3,902,220.00. The Continuing Pledge Agreement further stated that "IFC shall have the first and paramount rights to receive payment under those contracts." *See* Exhibit F at Section 1.

47. Given the distrust between IFC and the Ron Defendants created by the Ron Defendants' continued defaults on payments owed to IFC, as a condition for and to induce IFC to enter into the Settlement Agreement, Master Lease No. 801109, and Master Amendment Agreement, Steve and Spirit executed Schedule B to the Continuing Pledge Agreement entitled "Acknowledgment and Consent to Assignment" which stated that TPTC and PCDI "are subcontractors in connection with the [CPA EPC Contracts] and that substantial sums of money in excess of $3,902,220.00 will become owing to them pursuant to said contracts." *See* Exhibit F at Schedule B.

48. Further, Steve and Spirit confirmed as follows:

> We confirm that after the date hereof and until receipt by us of written notice to the contrary from you, we will pay all amounts due or to become due by us to TPTC or PCDI, up to $390,222 per month and in the aggregate amount of $3,900,222 under the [CPA] EPC Contracts to you by making payment to you at 8700 N. Waukegan Road, Suite 100, Morton Grove, IL 60053, or pursuant to such wire transfer instructions as you may from time to time provide to us. **We confirm that the terms of the [CPA] EPC Contracts remain in full force and effect and that Tissue Products Technology Corporation and Partners Concepts Development, Inc. are subcontractors there under** and that neither we nor TPTC or PCDI are presently in breach of the terms of the [CPA] EPC Contracts.

*See* Exhibit F at Schedule B (emphasis added).

49. On April 19, 2007, the consolidated GWS Bank Lawsuit/IFC Lawsuit I was dismissed with prejudice pursuant to settlement.

50. PCDI and TPTC subsequently defaulted under the terms of Master Lease No. 801109 by, *inter alia*, failing to make the lease payments required under the Lease Schedules attached to Master Lease No. 801109 from approximately April 19, 2007 through September 6, 2007. PCDI and TPTC failed to cure their defaults.

51. On September 6, 2007, IFC filed a second lawsuit against the Ron Defendants and also against Spirit (1) alleging breach of the Settlement Agreement by all of the Ron Defendants; (2) alleging breach of Master Lease No. 801109 by PCDI and TPTC; (3) alleging breach of the Master Lease No. 801109 Guaranty by Ron, and (4) requesting a preliminary injunction prohibiting Spirit from transferring any money to PCDI or TPTC until the Ron Defendants' obligations under the Settlement Agreement, Master Lease No. 801109, and Master Amendment Agreement, and Continuing Pledge Agreement were paid to IFC in full (the "Second IFC Lawsuit").

52. On August 13, 2008, the court in the Second IFC Lawsuit entered a judgment against TPTC, PCDI, and Ron, jointly and severally, in the total judgment amount of $5,343,015.12. *See* IFC Judgment, attached as Exhibit H. Neither IFC nor RNS Servicing has been able to collect on this judgment from TPTC, PCDI, or Ron.

53. On March 31, 2009, the court in the Second IFC Lawsuit granted summary judgment to Spirit on IFC's lone claim against Spirit on the sole basis that IFC did not have standing to bring a claim against Spirit for injunctive relief at that time. *See* March 31, 2009 Order, attached as Exhibit I.

54. On July 27, 2009, IFC filed for Chapter 7 Bankruptcy. To date, the IFC Bankruptcy is still pending.

55. On August 7, 2014, the IFC Bankruptcy court authorized the IFC Bankruptcy Trustee to enter into an "Asset Purchase and Transition Services Agreement" with Plaintiff RNS

Servicing (the "First RNS Asset Purchase Agreement"). Through the First RNS Asset Purchase Agreement, RNS Servicing purchased certain of IFC's bankruptcy estate's assets, including IFC's rights under the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement and all claims and rights, and benefits arising there from, with or against all persons or entities relating to IFC's rights under those agreements, including the claims against Steve and Spirit made in this Complaint. *See* First RNS Asset Purchase Agreement at Art. 1.1, Art. 2.2, attached as Exhibit J. Further, pursuant to the First Asset Purchase Agreement, RNS Servicing did not assume any of the IFC Bankruptcy estate's liabilities. *See* Exhibit J at Art. 2.6.

56. On February 4, 2015, the IFC Bankruptcy court authorized the IFC Bankruptcy Trustee to enter into a "Supplemental Asset Purchase and Transition Services Agreement" with Plaintiff RNS Servicing (the "Second RNS Asset Purchase Agreement"). Through the Second RNS Asset Purchase Agreement, RNS Servicing purchased certain of IFC's bankruptcy estate's assets, including the assignment of IFC's August 13, 2008 judgment against TPTC, PCDI, and Ron. *See* Second RNS Asset Purchase Agreement at Art. 1.1 and 2.1, attached as Exhibit K. Further, pursuant to the Second Asset Purchase Agreement, RNS Servicing did not assume any of the IFC Bankruptcy estate's liabilities. *See* Exhibit K at Art. 2.4.

57. On March 21, 2016, RNS Servicing learned that the CPA EPC Contracts were frivolous contracts through an email from Mr. Tak, one of the parties executing the EPC Contracts. *See* March 21, 2016 Email, attached as Exhibit L. Mr. Tak also confirmed that Spirit and VOS Electric, Inc.—which on information and belief, RNS Servicing believes to be related to Steve, Sprit, and/or Ron—has executed other EPC Contracts, which resulted in actual construction. *See* Exhibit L.

**COUNT I**
**NEGLIGENT MISREPRESENTATION – AGAINST STEVE AND SPIRIT**

58. Plaintiff hereby restates, realleges, and incorporates herein by reference Paragraphs 1–57 as if set forth fully in this Paragraph 58.

59. On or around March 28, 2007, Steve and Spirit made at least three false statements of material fact that induced IFC into executing the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement. To wit:

a. Steve and Spirit stated that TPTC and PCDI were subcontractors in connection with the four CPA EPC Contracts between Spirit and ST Paper and that substantial sums of money in excess of $3,902,220.00 will become owing to TPTC and PCDI pursuant to said contracts. *See* Exhibit F at Schedule B.

b. Steve and Spirit stated that after March 28, 2007 and until receipt by Steve and Spirit of written notice to the contrary from IFC, Spirit will pay all amounts due or to become due by Spirit to TPTC or PCDI, up to $390,222 per month and in the aggregate amount of $3,900,222 under the CPA EPC Contracts to IFC by making payment to IFC at 8700 N. Waukegan Road, Suite 100, Morton Grove, IL 60053, or pursuant to such wire transfer instructions as IFC may from time to time provide to Spirit. *See* Exhibit F at Schedule B.

c. Steve and Spirit stated that that the terms of the four CPA EPC Contracts remain in full force and effect and that TPTC and PCDI are subcontractors there under and that neither Spirit nor TPTC or PCDI are presently in breach of the terms of the CPA EPC Contracts. *See* Exhibit F at Schedule B.

60. Steve and Spirit owed IFC a duty to provide accurate information related to the complex transaction contemplated by the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement.

61. Steve and Spirit knew or should have known that their March 28, 2007 statements referenced in Paragraph 59 were false.

62. IFC communicated to Ron, Steve, and Spirit that IFC would not enter into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement without Steve and Spirit's signed confirmation of the statements made in Schedule B to the Continuing Pledge Agreement.

63. Steve and Spirit intended Schedule B to the Continuing Pledge Agreement and the false statements therein to induce IFC to enter into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement with Ron, Steve's brother, and Ron's companies.

64. Indeed, IFC would not have entered into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement without Steve and Spirit's signed confirmation of the statements made in Schedule B to the Continuing Pledge Agreement.

65. In reliance of the Steve and Spirits statements in Schedule B to the Continuing Pledge Agreement—as well as Steve and Spirit's continued representations that Spirit would subcontract TPTC and PCDI to perform work related to various EPC Contracts during negotiation of the complex transaction from October 2005 through April 2007 which eventually materialized as the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement—IFC entered into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement.

66. As a result of IFC's reliance on Steve and Spirits statements in Schedule B to the Continuing Pledge Agreement, RNS Servicing, as successor-in-interest to IFC's rights under the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement, RNS Servicing has not been paid the monies owed to it under the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement, that is $3,900,222 plus accumulated interest.

67. As such, RNS Servicing's damages as a result of Steve and Spirit's negligent misrepresentations are in excess of $15 million.

WHEREFORE, Plaintiff, RNS SERVICING, LLC, respectfully requests that this Court enter judgment in their favor and against Defendants, STEVEN VAN DEN HEUVAL and SPIRIT CONSTRUCTION SERVICES, INC., as follows:

a. For compensatory damages in an amount to be proven at trial, which Plaintiffs believe will materially exceed $1 million plus costs of suit; and

b. For such other relief as this court deems just and proper.

**COUNT II**
**FRAUDULENT INDUCEMENT – AGAINST STEVE AND SPIRIT**

68. Plaintiff hereby restates, realleges, and incorporates herein by reference Paragraphs 1–57 as if set forth fully in this Paragraph 68.

69. On or around March 28, 2007, Steve and Spirit made at least three false statements of material fact that induced IFC into executing the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement. To wit:

a. Steve and Spirit stated that TPTC and PCDI were subcontractors in connection with the four CPA EPC Contracts between Spirit and ST Paper and that

substantial sums of money in excess of $3,902,220.00 will become owing to TPTC and PCDI pursuant to said contracts. *See* Exhibit F at Schedule B.

b. Steve and Spirit stated that after March 28, 2007 and until receipt by Steve and Spirit of written notice to the contrary from IFC, Spirit will pay all amounts due or to become due by Spirit to TPTC or PCDI, up to $390,222 per month and in the aggregate amount of $3,900,222 under the CPA EPC Contracts to IFC by making payment to IFC at 8700 N. Waukegan Road, Suite 100, Morton Grove, IL 60053, or pursuant to such wire transfer instructions as IFC may from time to time provide to Spirit. *See* Exhibit F at Schedule B.

c. Steve and Spirit stated that that the terms of the four CPA EPC Contracts remain in full force and effect and that TPTC and PCDI are subcontractors there under and that neither Spirit nor TPTC or PCDI are presently in breach of the terms of the CPA EPC Contracts. *See* Exhibit F at Schedule B.

70. Steve and Spirit knew that their March 28, 2007 statements referenced in Paragraph 69 were false.

71. IFC communicated to Ron, Steve, and Spirit that IFC would not enter into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement without Steve and Spirit's signed confirmation of the statements made in Schedule B to the Continuing Pledge Agreement.

72. Steve and Spirit intended Schedule B to the Continuing Pledge Agreement and the false statements therein to induce IFC to enter into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement with Ron, Steve's brother, and Ron's companies.

73. Indeed, IFC would not have entered into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement without Steve and Spirit's signed confirmation of the statements made in Schedule B to the Continuing Pledge Agreement.

74. In reliance of the Steve and Spirits statements in Schedule B to the Continuing Pledge Agreement—as well as Steve and Spirit's continued representations that Spirit would subcontract TPTC and PCDI to perform work related to various EPC Contracts during negotiation of the complex transaction from October 2005 through April 2007 which eventually materialized as the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement—IFC entered into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement.

75. As a result of IFC's reliance on Steve and Spirits statements in Schedule B to the Continuing Pledge Agreement, RNS Servicing, as successor-in-interest to IFC's rights under the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement, RNS Servicing has not been paid the monies owed to it under the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement, that is $3,900,222 plus accumulated interest.

76. As such, RNS Servicing's damages as a result of Steve and Spirit's fraudulent misrepresentations are in excess of $15 million.

WHEREFORE, Plaintiff, RNS SERVICING, LLC, respectfully requests that this Court enter judgment in their favor and against Defendants, STEVEN VAN DEN HEUVAL and SPIRIT CONSTRUCTION SERVICES, INC., as follows:

c. For compensatory damages in an amount to be proven at trial, which Plaintiffs believe will materially exceed $1 million plus costs of suit;

d. For punitive damages; and

e. For such other relief as this court deems just and proper.

**COUNT III**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/2) – AGAINST STEVE AND SPIRIT**

77. Plaintiff hereby restates, realleges, and incorporates herein by reference Paragraphs 1–57 as if set forth fully in this Paragraph 77.

78. On or around March 28, 2007, Steve and Spirit made at least three false statements of material fact that induced IFC into executing the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement. To wit:

a. Steve and Spirit stated that TPTC and PCDI were subcontractors in connection with the four CPA EPC Contracts between Spirit and ST Paper and that substantial sums of money in excess of $3,902,220.00 will become owing to TPTC and PCDI pursuant to said contracts. *See* Exhibit F at Schedule B.

b. Steve and Spirit stated that after March 28, 2007 and until receipt by Steve and Spirit of written notice to the contrary from IFC, Spirit will pay all amounts due or to become due by Spirit to TPTC or PCDI, up to $390,222 per month and in the aggregate amount of $3,900,222 under the CPA EPC Contracts to IFC by making payment to IFC at 8700 N. Waukegan Road, Suite 100, Morton Grove, IL 60053, or pursuant to such wire transfer instructions as IFC may from time to time provide to Spirit. *See* Exhibit F at Schedule B.

c. Steve and Spirit stated that that the terms of the four CPA EPC Contracts remain in full force and effect and that TPTC and PCDI are subcontractors there under and that neither Spirit nor TPTC or PCDI are presently in breach of the terms of the CPA EPC Contracts. *See* Exhibit F at Schedule B.

79. The statements referenced in Paragraph 78 were false.

80. IFC communicated to Ron, Steve, and Spirit that IFC would not enter into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement without Steve and Spirit's signed confirmation of the statements made in Schedule B to the Continuing Pledge Agreement.

81. Steve and Spirit intended Schedule B to the Continuing Pledge Agreement and the false statements therein to induce IFC to enter into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement with Ron, Steve's brother, and Ron's companies.

82. Indeed, IFC would not have entered into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement without Steve and Spirit's signed confirmation of the statements made in Schedule B to the Continuing Pledge Agreement.

83. In reliance of the Steve and Spirits statements in Schedule B to the Continuing Pledge Agreement—as well as Steve and Spirit's continued representations that Spirit would subcontract TPTC and PCDI to perform work related to various EPC Contracts during negotiation of the complex transaction from October 2005 through April 2007 which eventually materialized as the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement—IFC entered into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement.

84. As a result of IFC's reliance on Steve and Spirits statements in Schedule B to the Continuing Pledge Agreement, RNS Servicing, as successor-in-interest to IFC's rights under the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement, RNS Servicing has not been paid the monies owed to it under the

Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement, that is $3,900,222 plus accumulated interest.

85. As such, RNS Servicing's damages as a result of Steve and Spirit's violation of the Illinois Consumer Fraud And Deceptive Business Practices Act are in excess of $15 million.

WHEREFORE, Plaintiff, RNS SERVICING, LLC, respectfully requests that this Court enter judgment in their favor and against Defendants, STEVEN VAN DEN HEUVAL and SPIRIT CONSTRUCTION SERVICES, INC., as follows:

a. For compensatory damages in an amount to be proven at trial, which Plaintiffs believe will materially exceed $1 million plus costs of suit;

b. For punitive damages;

c. For attorneys' fees; and

d. For such other relief as this court deems just and proper.

**COUNT IV**
**CIVIL CONSPIRACY – AGAINST STEVE AND SPIRIT**

86. Plaintiff hereby restates, realleges, and incorporates herein by reference Paragraphs 1–57 as if set forth fully in this Paragraph 86.

87. Since at least October 2005, Steve, Spirit, Ron, PCDI, and TPTC agreed and conspired to wrongfully and unlawfully induce IFC to enter into the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement with no intention of honoring the obligations under those agreements.

88. As such, the underlying tort for this Civil Conspiracy count is Count II of this Complaint alleging Fraudulent Inducement against Steve and Spirit.

89. Steve, Spirit, Ron, PCDI, and TPTC conspired to keep the funds Ron, PCDI, and TPTC borrowed from IFC pursuant to the Settlement Agreement, Master Lease No. 801109,

Master Amendment Agreement, and Continuing Pledge Agreement through unlawful means such as false statements made by Steve and Spirit in Schedule B to the Continuing Pledge Agreement.

90. Pursuant to and in furtherance of this conspiracy, Steve and Spirit knowingly, tortiously, maliciously, and unlawfully committed overt acts, including but not limited to their false statements made in Schedule B to the Continuing Pledge Agreement.

91. At all times relevant, Steve and Spirit understood the general objective of the conspiracy and agreed, either explicitly or implicitly, to do their respective parts to further the objects of the conspiracy. The general objective of the conspiracy was to obtain and take control of funds borrowed by Ron, PCDI, and TPTC without repayment.

92. As a direct and proximate result of the conspiracy, RNS Servicing, as successor-in-interest to IFC's rights under the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement, RNS Servicing has not been paid the monies owed to it under the Settlement Agreement, Master Lease No. 801109, Master Amendment Agreement, and Continuing Pledge Agreement, that is $3,900,222 plus accumulated interest.

93. As such, RNS Servicing's damages as a result of the conspiracy are in excess of $15 million.

WHEREFORE, Plaintiff, RNS SERVICING, LLC, respectfully requests that this Court enter judgment in their favor and against Defendants, STEVEN VAN DEN HEUVAL and SPIRIT CONSTRUCTION SERVICES, INC., as follows:

a. For compensatory damages in an amount to be proven at trial, which Plaintiffs believe will materially exceed $1 million plus costs of suit;

b. For punitive damages; and

c. For such other relief as this court deems just and proper.

**JURY DEMAND**

Plaintiff, RNS SERVICING, LLC, demands trial by jury on all issues so triable.

Respectfully submitted,

**/s/ Brian C. Langs**
Attorney for Plaintiff, RNS SERVICING, LLC

Joseph R. Marconi
Victor J. Pioli
Brian C. Langs
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
Fax: (312) 372-9818
E-mail: langsb@jbltd.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 6, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

**/s/ Brian C. Langs**
Attorney for Plaintiff, RNS SERVICING, LLC