UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RNS SERVICING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17-cv-00108 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| SPIRIT CONSTRUCTION SERVICES, | ) | |
| INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

More than a decade ago, RNS Servicing's predecessor-in-interest (IFC Credit Corporation) entered into a settlement agreement that was supposed to be worth $3.9 million but later turned out to be worth nothing. RNS now alleges that Defendants Spirit Construction, Steve Van Den Heuvel, and Sharad Tak fraudulently induced IFC to enter into the agreement. R. 31, Am. Compl.[1] As Defendants point out, however, the alleged fraud occurred back in 2007, which they argue is way beyond the scope of any relevant statute of limitations that might govern this case. Naturally, the parties now dispute when exactly the claims against Defendants accrued and started the ticking of the limitations clock. Defendants argue that IFC should have known about the alleged fraud back in 2007 or 2008 at the latest, while RNS maintains that the limitations period did not start running until 2016.

---

[1]Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

1

The statute of limitations issue was first raised at the pleading stage, but the Court held off on ruling until the parties were given an opportunity to engage in limited discovery on the issue. R. 51. Now that discovery on this issue is complete, the parties have filed cross-motions for summary judgment on the limitations question only. R. 64; R. 76. For the reasons discussed below, RNS's motion is denied, and the Defendants' motion is granted: the case was untimely filed and is dismissed.

## I. Background

The facts narrated below are undisputed unless otherwise noted.[2] In 2005, IFC Credit Corporation, an equipment-lease finance company, entered into a series of lease agreements with a group of tissue-paper manufacturing companies. R. 65, DSOF ¶¶ 10, 12. These tissue-paper manufacturing companies were all operated by an individual named Ron Van Den Heuvel. *Id.* ¶ 14. For the sake of convenience, the companies will collectively be referred to as the "Ron Companies."

Unfortunately, the Ron Companies soon defaulted on the leasing agreements; IFC sued the Ron Companies for breach of contract; and then IFC and Ron tried to work out various settlement agreements. DSOF ¶¶ 14-18. This initial settlement process proved largely unsuccessful until Ron enlisted the help of his brother, Steve Van Den Heuvel. Long story short, IFC eventually agreed to settle its claims against the Ron Companies for a total of $23.9 million. *Id.* ¶¶ 23, 29-30. The bulk of the

---

[2]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendants' Statement of Facts [R. 65]; "Pl.'s Resp. DSOF" for RNS's response to the Defendants' Statement of Facts [R. 75]; "PSOF" for RNS's Statement of Additional Facts [R. 75]; and "Defs.' Resp. PSOF" for the Defendants' response to RNS's Statement of Additional Facts [R. 85].

settlement would be paid upfront,[3] while the remaining $3.9 million would be paid to IFC in monthly installments. *Id.* ¶¶ 23, 28.

Here is where Steve comes in. Steve owned a construction company called Spirit Construction. DSOF ¶ 2. And while all of this was going on, Spirit had entered into a construction deal with another company called ST Paper I, which was owned by an individual named Sharad Tak. *Id.* ¶¶ 3, 19. Pursuant to this deal, Steve and Tak had apparently executed four contracts for Spirit to perform engineering procurement and construction work for ST Paper I. *Id.* ¶ 19. These will be referred to as the EPC Contracts. The EPC Contracts were supposed to be lucrative; RNS alleges that each contract was represented to be worth at least $200 to $400 million. R. 75, PSOF ¶ 6. The plan was for Spirit to hire the Ron Companies as subcontractors on the four EPC projects. DSOF ¶ 26. That meant the Ron Companies would work on the EPC projects in exchange for subcontractor payments, which could then be used by the Ron Companies to pay back IFC. Indeed, the Ron Companies explicitly assigned to IFC their right to receive the first $3.9 million in subcontractor payments under the EPC Contracts. *Id.* ¶ 28. According to Ron, the EPC Contracts would be funded within a few weeks. R. 75, Pl.'s Resp. DSOF ¶ 37.

What really cinched the deal was that Spirit and Steve also signed a separate agreement to make the EPC subcontractor payments directly to IFC until Ron's $3.9

---

[3]This upfront portion of the settlement payment was technically split between two other lenders (Fortress and George Washington State Bank); it did not go to IFC. Pl.'s Resp. DSOF ¶ 33. IFC had previously transferred to Fortress and GWS Bank certain rights to lease payments from the Ron Companies, which is why Fortress and GWS Bank were part of the ultimate settlement agreement with Ron. DSOF ¶¶ 11, 14.

3

million debt had been paid off. DSOF ¶ 30. So instead of Spirit paying Ron and then Ron paying IFC, Spirit would just *directly* pay IFC. Also, Spirit and Steve acknowledged in writing that the Ron Companies were indeed subcontractors in connection with the EPC Contracts; they would receive more than $3.9 million in subcontractor payments; and the EPC Contracts were in full force and effect. *Id.* ¶¶ 26-30. Around this same time, IFC also received in-person assurances about the EPC Contracts from Tak. Specifically, Tak met with IFC's CEO (Rudy Trebels) and CFO (Marc Langs) and confirmed that he and Steve had in fact executed the EPC Contracts; he fully intended to build the four projects contemplated by the four EPC Contracts; the EPC Contracts would be sufficiently financed; and finally, the Ron Companies would be hired as subcontractors under the EPC Contracts. *Id.* ¶¶ 31-32.

The parties dispute whether IFC ever reviewed the four EPC Contracts themselves before entering the settlement agreement. According to RNS, Defendants refused to allow IFC to access the EPC Contracts because of "regulatory and confidentiality concerns." PSOF ¶¶ 8, 12. Defendants, on the other hand, maintain that IFC was given access to the contracts. R. 85, Defs.' Resp. PSOF ¶ 12. In any event, IFC apparently believed that the Ron Companies would have access to ample income via the EPC Contracts, which is why IFC agreed to formally settle its claims against the Ron Companies in March 2007.

But the money did not start pouring in. By June 2007, Ron had still not yet made a single payment. DSOF ¶ 33; Pl.'s Resp. DSOF ¶ 33. So, in September 2007, IFC initiated its second lawsuit against Ron, this time for breaching the settlement

4

agreement and misrepresenting the funding status of the EPC Contracts. *Id.* ¶ 34. In the complaint, IFC also named Spirit as a defendant, seeking a preliminary injunction prohibiting Spirit from making any direct payments to the Ron Companies until IFC's $3.9 million debt had first been paid off. *Id.*

The second case eventually proceeded to discovery and then summary judgment. In support of summary judgment, Marc Langs (IFC's CFO) signed an affidavit in which he stated that "IFC would not have agreed to allow [the Ron Companies] a ten-month payment schedule if we had known that the EPC Contracts were not going to be funded for many months (to our knowledge, the EPC Contracts are still not funded.) Nor would IFC have allowed [the Ron Companies] a ten-month payment schedule if we knew that those companies were not going to receive 'substantial payments' under the EPC Contracts." DSOF ¶ 37.

In 2009, the judge presiding over the second case ultimately denied IFC's motion for summary judgment on its injunctive-relief claim against Spirit and granted Spirit's summary judgment motion against that same claim. PSOF ¶ 14. (IFC did prevail on its claims against the Ron Companies, Pl.'s Resp. DSOF ¶ 40, but as a practical matter IFC could not collect on the judgment.) In the order denying summary judgment against Spirit, the court explained that IFC did not have standing for its claim against Spirit, because Spirit had not yet breached its obligations under the settlement agreement. DSOF ¶ 40; Pl.'s Resp. DSOF ¶ 40. Spirit's contractual obligation was to pay IFC once Ron started working as a subcontractor on the EPC Contracts, but because the EPC projects had not yet begun,

5

it was premature for IFC to claim that Spirit was withholding subcontractor payments from IFC. *Id*.

This was the end of the dispute for a while. According to IFC, its lawyers reviewed the summary judgment order and decided that (1) IFC could not in good faith appeal the order and (2) IFC did not have "standing" to make any claim against Spirit, including fraud. PSOF ¶ 15. But there was another reason the dispute ended in 2009. As Marc Langs later testified, the 2007 lawsuit against Ron and Spirit was only the "first step" of a longer "process to look at and go back and find out what happened" with the Ron transaction. Pl.'s Resp. DSOF ¶ 41. Unfortunately for IFC, though, this investigatory process was "interrupted" in 2009, when IFC was forced to file for Chapter 7 bankruptcy. *Id*.; PSOF ¶ 17. During the bankruptcy process, Trebels and Langs resigned, PSOF ¶ 18, and then the Bankruptcy Trustee hired RNS Servicing to come in and help with the IFC liquidation, DSOF ¶ 44.

Over the next six or so years, RNS worked on collecting on IFC's outstanding equipment-lease accounts. PSOF ¶ 20. At some point in 2010, RNS became aware of the outstanding court judgment against the Ron Companies. *Id*. ¶ 21. And then in 2014, RNS actually purchased all of IFC's rights under the settlement agreement with the Ron Companies. DSOF ¶ 45. But it is undisputed that at no point during this six-year period did RNS or the IFC Bankruptcy Trustee look into potential legal claims against Spirit, Steve, or Tak. PSOF ¶¶ 21-22.

That all changed in 2016. At that point, seven years after the bankruptcy and nine years after the initial alleged misrepresentations had been made, RNS reached

6

out to Marc Langs, IFC's former CFO. Specifically, RNS hired Langs to serve as an independent consultant to assist RNS in enforcing the earlier judgment against Ron. PSOF ¶ 25. In connection with this project, RNS gave Langs access to "voluminous documentation" from the IFC bankruptcy estate to review, and Langs in turn filled RNS in on the story of the 2007 settlement discussions with Ron, including the representations that Spirit and Steve made about the EPC Contracts, as well as the meeting about the EPC Contracts with Tak. *Id.* ¶ 28.

After Langs was brought onboard by RNS to investigate the Ron transaction, he decided to follow up on the status of the EPC Contracts. So, in March 2016, Langs called Steve. PSOF ¶ 30. Steve told Langs that the EPC projects had never been built. *Id.* That same month, Langs also emailed Tak; during their email exchange, Tak revealed that the EPC Contracts had been "frivolous" all along. DSOF ¶ 49. Finally, Langs met with Steve in person, which is when Steve confirmed that the EPC Contracts had never been funded but reiterated that he still hoped the projects would go forward in the future. PSOF ¶ 36.

It was shortly after these conversations that RNS retained counsel and began pursuing the current litigation against the Defendants. PSOF ¶ 37. In January 2017, RNS (as the successor-in-interest to IFC) filed its original complaint alleging various fraud claims against Spirit and Steve, R. 1, and in September 2017, RNS filed an amended complaint adding Tak as a defendant. R. 31. Against all Defendants, RNS alleges fraudulent inducement, negligent misrepresentation, and civil conspiracy, as well as claims under the Illinois Consumer Fraud Act.

7

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[4] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

8

### III. Analysis

IFC argues that it only agreed to settle its claims against the Ron Companies because it believed—based on the alleged misrepresentations by Spirit, Steve, and Tak—that the EPC Contracts would be a valuable revenue stream for the Ron Companies. When that turned out to not be true, IFC initiated this current fraud lawsuit against Spirit, Steve, and Tak. But before getting to the merits of these fraud claims, the parties dispute whether this case was brought on time under the relevant statutes of limitations.

There is no dispute that the alleged misrepresentations by Spirit, Steve, and Tak were made in 2007. There is also no dispute that the statute of limitations for RNS's common law fraud and civil conspiracy claims is five years, 735 ILCS 5/13-205, while the statute of limitations for the ICFA claim is three years, 815 ILCS 505/10a(e). Meanwhile, the complaint (naming Spirit and Steve) and amended complaint (adding claims against Tak) in this case were both filed in 2017. So, at first glance, RNS's claims would seem to fall outside of the statutes of limitations. RNS resists this conclusion, and the Court now turns to RNS's arguments.

#### A. Discovery Rule

RNS first argues that the discovery rule should apply. Under Illinois law, the discovery rule "delays the start of the limitations period until the claimant knew or reasonably should have known of the injury and that the injury was wrongfully caused." *Am. Family Mut. Ins. Co. v. Krop*, 120 N.E.3d 982, 987-88 (Ill. 2018). This is also called inquiry notice, and what it means is that the statute of limitations starts

to run when the plaintiff "is under an obligation to inquire further to determine whether an actionable wrong was committed." *Knox College v. Celotex Corp.*, 430 N.E.2d 976, 980 (Ill. 1981) (cleaned up). Inquiry notice is different from *actual* notice; the plaintiff does not need to know every fact about the injury in order for the statute of limitations to start running. For instance, the plaintiff does not necessarily have to know the identity of every potential wrongdoer. *Wells v. Travis*, 672 N.E.2d 789, 793 (Ill. App. Ct. 1996) ("Knowledge that an injury has been 'wrongfully caused' does not mean knowledge of a specific defendant's negligent conduct."). So, here, the question is: at what point did IFC either realize, or have reason to realize, that the status of the EPC Contracts had been misrepresented?

Defendants naturally argue that IFC knew or reasonably should have known about its potential claims against them in 2007, when it first realized that Ron was not making any payments on the settlement agreement. R. 67, Defs.' Br. at 11. That alone should have put IFC on notice that Ron did not have access to the EPC Contract revenue that Defendants said he had access to, which in turn meant that Defendants, who vouched for Ron having access to ample revenue, might have lied to IFC too. In the alternative, Defendants argue that even if IFC did not suspect the alleged fraud in 2007, then IFC was definitely on inquiry notice (at the very least) by the following year, as evidenced by several of IFC's litigation positions during the lawsuit. *Id.* at 12. For instance, in 2008, IFC wrote in its motion for summary judgment against the Ron Companies and Spirit that "[a]ccording to Spirit Construction's president, neither [of the Ron Companies] were ever seriously considered by Spirit Construction

10

to be likely subcontractors in connection with the construction contracts. In any event, those construction contracts are still not funded." DSOF ¶ 38. In support of that same motion, Marc Langs also submitted an affidavit stating that "IFC would not have agreed to allow [the Ron Companies] a ten-month payment schedule if we had known that the EPC Contracts were not going to be funded for many months." *Id*. ¶ 37. And finally, in October 2008, IFC also filed a motion to strike in which it referenced "the fraud committed by Spirit Construction to induce IFC to enter into the Settlement Agreement" and the fact that "notwithstanding its statement to IFC, Spirit Construction never intended to engage [the Ron Companies] in connection with the EPC Contracts." *Id*. ¶ 39.

RNS, for its part, contends that there was no reason for IFC to suspect fraud on the part of the Defendants until March 2016, when Tak revealed for the first time over email that the EPC Contracts were "frivolous." R. 76, Pl.'s Resp. Br. at 2. According to RNS, none of its litigation positions in the 2007 lawsuit matter because the 2007 lawsuit targeted an entirely different injury than the injury at issue in this current case. *Id*. at 3. Specifically, the 2007 lawsuit was supposedly all about *Ron* failing to make installment payments pursuant to the settlement agreement, as well as alleged misrepresentations by *Ron* pertaining to when the EPC Contracts would be funded. *Id*. at 5. This case, on the other hand, is specifically about the misrepresentations that *Spirit, Steve, and Tak* allegedly made about the EPC Contracts. *Id*. And with regard to the specific litigation statements Defendants point to as evidence that IFC knew Spirit had made misrepresentations, RNS explains that

11

many of those statements were based on a confusing series of misunderstandings about a contract that IFC's counsel had shown Steve during his April 2008 deposition; Steve had apparently made some representation about that contract being an EPC Contract and then backtracked on his words later in the deposition. *Id.* at 6-7.

But even if IFC had only accused Spirit of lying based on a misunderstanding about documents shown during a deposition, that does not change the fact that, from a broader perspective, IFC indisputably suspected that Spirit was lying about something. Based on that suspicion, IFC had an obligation to investigate Spirit and the other Defendants. Specifically, when IFC realized that Ron was not making payments under the settlement agreement, IFC was on notice that a number of things could have gone wrong. For instance, it was possible that Ron simply lied about how long it would take for the contracts to be funded. And indeed, IFC picked up on that possibility and brought the 2007 lawsuit against Ron. But IFC should have also investigated whether *anyone else* who made representations about the EPC Contracts also lied. It took no extraordinary business or legal acumen to know that more investigation was needed. For instance, if the contracts would not be funded in just a few weeks, as Ron has said, then how long would it actually take for them to be funded? When were the four projects supposed to start? At what point were the Ron Companies supposed to get paid under the contracts? Were the Ron Companies in fact hired as subcontractors? Were the contracts worth as much as IFC thought they were worth? IFC apparently did not ask any of those basic questions.

So, even accepting as true RNS's allegations that IFC had no actual knowledge that Spirit, Steve, or Tak had misrepresented the status of the EPC Contracts in 2007 or 2008, that does not mean IFC could not have been on *inquiry* notice. And RNS puts far too much stock in the distinction between the 2007 fraud claims against Ron and the current fraud claims against the Defendants. Yes, the lawsuit technically and initially targeted only Ron. *See* Pl.'s Resp. Br. at 5. But RNS has not provided a convincing explanation for why IFC did not investigate whether Spirit, Steve, and Tak *also* lied when it first suspected that Ron had lied about the status of the EPC Contracts. At that point, IFC knew that Spirit, Steve, and Tak had also made representations about the EPC Contracts. Just because those representations did not come from Ron does not mean that IFC had no obligation to investigate those other speakers and statements.

For these reasons, the Court concludes that RNS was on inquiry notice of the fraud claims against Defendants by 2007, when it filed its lawsuit against the Ron Companies and Spirit, and by 2008 at the very latest, as evidenced by its litigation positions in that lawsuit. Thus, the claims are barred by the three- and five-year statutes of limitations unless one of the tolling exceptions raised by RNS applies.

### B. Equitable Tolling

On tolling, RNS first asserts that even if the claims did accrue back in 2007 or 2008, they were equitably tolled for seven years between 2009 and 2016 because of the previous court's 2009 summary judgment ruling that IFC "lacked standing to assert its claim for injunctive relief against Spirit—which was based on Spirit's

13

alleged misrepresentations in this case." Pl.'s Resp. Br. at 17. "While equitable tolling is recognized in Illinois, it is rarely applied." *Am. Family Mut. Ins. Co. v. Plunkett*, 14 N.E.3d 676, 681 (Ill. App. Ct. 2014). In order for equitable tolling to apply, a plaintiff must have (1) pursued its rights diligently and (2) been prevented from filing on time by some extraordinary circumstance. *Holland v. Florida*, 560 U.S. 631, 649 (2010). "Extraordinary barriers include legal disability, an irredeemable lack of information, or situations where the plaintiff could not learn the identity of proper defendants through the exercise of due diligence." *Plunkett*, 14 N.E.3d at 681 (cleaned up).

Here, RNS argues that the previous court's 2009 summary judgment was precisely that—an extraordinary circumstance that prevented IFC from asserting its fraud claims against Defendants at that time. But this argument is wrong. The previous court did *not* hold that IFC had no standing to pursue any *fraud* claims against Spirit. Rather, the previous court held that IFC had no standing to pursue a *contract* claim against Spirit. *See IFC Credit Corp. v. Tissue Prod. Tech. Corp.*, 2009 WL 901009, at *10 (N.D. Ill. Mar. 31, 2009) ("Presently, a breach has not occurred nor has IFC presented evidence that a breach is likely to occur in the near future."). To the extent that IFC in that lawsuit was merely trying to ensure that Spirit held up its end of the deal under the settlement agreement—that is, make sure all subcontractor payments owed to Ron were funneled to IFC instead—then the court was correct in holding that Spirit had not yet breached that agreement. But there was nothing in the 2009 summary judgment ruling preventing IFC from bringing a new lawsuit (or adding a claim) against Spirit (and Steve and Tak) alleging that they

14

fraudulently misrepresented the status or existence of the EPC Contracts in the first place. Moreover, even if the previous court had somehow opined on IFC's ability to bring fraud claims against Defendants, there was nothing preventing IFC from appealing that decision. Thus, the 2009 summary judgment ruling does not constitute an extraordinary circumstance that would warrant equitable tolling.

The diligence requirement has also not been met. As the Defendants point out, "the only thing preventing the discovery of the purportedly revelatory information Langs learned from Tak in the March 2016 email exchange sooner was [IFC's] own lack of diligence." Defs.' Br. at 16. Well before March 2016, IFC could have resorted to the court to examine the four EPC Contracts themselves, considering how central they were to the entire $3.9 million settlement agreement. According to RNS, IFC asked Defendants for the contracts, and Defendants refused on supposed confidentiality and regulatory grounds. PSOF ¶ 1. (Defendants dispute this fact. Defs.' Resp. PSOF ¶ 1.) But even if that happened (as the Court assumes it did to view the evidence in RNS's favor), IFC did not have to stop there. IFC could have issued a formal discovery request or subpoena for the contracts, and if that did not work, IFC could have then filed a motion to compel production of the contracts. Given the gravity of the situation and the fact that IFC knew Ron was not making payments, IFC should have done more than continue to rely on the "good business reputations" of the Defendants.

Finally, even if the claims had somehow been equitably tolled starting in 2009, there is no explanation for why a tolling period of *seven years* is justified in this case.

Accepting RNS's allegations as true, then the only reason RNS discovered the fraud claims against Defendants was because of Tak's email revealing that the EPC Contracts had been "frivolous." The Tak email only came about because Marc Langs, in March 2016, decided to reach out to Tak to ask about the EPC Contracts. But why did RNS (and Marc Langs) wait until 2016 to reach out to Tak and Steve? IFC surely could have asked Tak and Steve that same question in 2007, or 2008, or even 2009. The bankruptcy proceeding is no excuse for a seven-year delay, nor are the subsequent resignations of Trebels and Langs; there is nothing extraordinary about executives leaving a company. Allowing those sorts of excuses as grounds for equitable tolling would break the dam wide open to tolling, contrary to Illinois law. Equitable tolling is not applicable to this case.

### C. Fraudulent Concealment

Finally, RNS argues that Defendants "fraudulently concealed the true 'frivolous' nature" of the EPC Contracts. R. 87, Pl.'s Reply Br. at 8. Under Illinois law, if a person conceals their liability for an action from the injured party, the statute of limitations is extended five years from the date of discovery. 735 ILCS 5/13-215. But the fraudulent-concealment exception only applies if the defendant took "*affirmative* acts or representations calculated to lull or induce a claimant into delaying filing of his or her claim, or to prevent a claimant from discovering a claim." *Orlak v. Loyola Univ. Health Sys.*, 885 N.E.2d 999, 1009 (Ill. 2007) (emphasis added). In fraud cases like this one, the "acts constituting fraudulent concealment are distinct from the acts that make the underlying conduct fraudulent." *Saleh as Tr. of Nabil Saleh M.D. LTD*

16

*Pension Plan v. Merch.*, 2019 WL 1331788, at *7 (N.D. Ill. Mar. 25, 2019) (citing *Gredell v. Wyeth Labs., Inc.*, 803 N.E.2d 541, 548-49 (Ill. App. Ct. 2004)).

Here, RNS argues that the Defendants fraudulently concealed IFC's claims when they refused to let IFC review the EPC Contracts "because regulatory concerns required Spirit and Tak to keep them confidential while Tak was seeking financing for the projects." Pl.'s Reply Br. at 9. IFC apparently did not push this point, because of the "good business reputations" of Defendants. *Id*. As explained above, however, the mere fact that Defendants refused to let IFC examine the EPC Contracts due to supposed regulatory concerns does not warrant any sort of tolling of the statute of limitations. Here, even if the Defendants did lie about the regulatory concerns, that does not amount to fraudulent *concealment* of IFC's claims.

It is true that the EPC Contracts themselves might have provided valuable *evidence* that would have helped IFC prove that Defendants misrepresented the status of the contracts. But in terms of discovering the potential fraud claim in the first place, IFC did not need to see the actual EPC Contracts to suspect that something might have been wrong with Defendants' representations. It is notable, for instance, that IFC thought to ask Defendants to examine the EPC Contracts in the first place. After all, if IFC truly had no idea that there was any problem with the status or existence of the EPC Contracts, then IFC would not have asked to see them. But the fact that IFC did ask Defendants to examine the contracts shows that IFC knew that the contracts themselves (or the lack thereof) would shed some light on why Ron had not been making settlement payments. And then Defendants' stubborn

17

resistance to handing over the contracts should have in itself been a red flag for IFC. Lastly, IFC took no steps to formally compel the Defendants to disclose the contracts, so IFC itself did not reasonably pursue the inquiry.

In short, even if Defendants committed a fraudulent act by lying about why they could not allow IFC to examine the EPC Contracts, that act of fraud did not do anything to prevent IFC from suspecting, investigating, and litigating its potential claims against Defendants. Thus, the fraudulent concealment exception does not apply here either.

## IV. Conclusion

For the reasons discussed above, RNS's claims are barred by the statutes of limitations. RNS's motion for summary judgment is thus denied, and Defendants' motion for summary judgment is granted. The status hearing of April 29, 2020 is vacated, and the Court will enter final judgment.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 25, 2020